UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-4551(DSD/JJG)

Rebecca Young,

       Plaintiff,

v.                                        **ORDER**

City of Monticello, City
Council for City of
Monticello, Rick Wolfsteller,
both in his personal and
professional capacity,

       Defendant.

    Stephen W. Cooper, Esq., Stacey R. Everson, Esq. and The
    Cooper Law Firm, Loring Green East, 1201 Yale Place,
    Suite A100, Minneapolis, MN 55403, counsel for plaintiff.

    Patricia Y. Beety, Esq., League of Minnesota Cities, 145
    University Avenue West, St. Paul, MN 55103, counsel for
    defendants.

This matter is before the court upon defendants' motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendants' motion in part.

**BACKGROUND**

This is, among other things, a civil rights action under 42 U.S.C. § 1983 for an alleged deprivation of rights under the First

Amendment of the United States Constitution.[1]  In March of 2002, defendant city of Monticello hired plaintiff Rebecca Young as a part-time receptionist.  Defendant Monticello City Council authorizes all city employment decisions and defendant Rick Wolfsteller, the city administrator, oversees all city employees.

In 2003, the city of Monticello proposed a controversial annexation of 11,700 acres of Monticello Township land.  Throughout the spring of 2004, the Monticello Township Board and Monticello City Council engaged in ongoing mediation sessions regarding the proposed annexation.  The annexation debate was the largest and most controversial issue before the city council at the time. (Thielen Dep. at 18.)

At all relevant times, Young lived and owned acreage in Monticello Township.  The annexation proposal included the land owned by Young and she and her husband openly opposed the city's annexation effort.  In October of 2003, they began to form a resistance group with other Monticello Township citizens to oppose the annexation.  In the spring of 2004, the group was sufficiently organized to hold a formal meeting.  During that initial meeting, the group named their organization the Monticello Township Citizens

---

[1] The statute provides that "[e]very person who, under color of [law], subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ...."  42 U.S.C. § 1983.

Against Annexation ("MTCAA") and nominated Young's husband to be the organization's chairperson. (Cooper Aff. Ex. A.)

In March of 2004, plaintiff created a document that contained a pattern to make "No Hostile Annexation" buttons. (See Beety Aff. Ex. 5.) Plaintiff used the city's computer to create the document over her lunch hour. Young ordered a 500-page ream of yellow paper through the city supplier and informed a co-worker that she intended to pay for the paper because it would be for personal use. Young had the button pattern approved by the MTCAA and then used the city photocopier to make fifty copies of the pattern on the yellow paper. Young left one of the copies of the anti-annexation button designs in the photocopier. On March 26, 2004, a city employee found the copy in the machine and gave it to Wolfsteller.

On April 2, Young went into the city office on a Saturday afternoon and used the city's computer to create a petition form for the MTCAA to gather the signatures of those who opposed annexation. (See Beety Aff. Ex. 6.) Young made fifty copies of the petition on the city's photocopier and again left a copy in the photocopier. On April 5, a city employee provided Wolfsteller with the copy of the petition form that Young had left in the machine. On April 8, Wolfsteller noticed an agenda for an upcoming MTCAA meeting to be held that evening and minutes from a previous MTCAA

3

meeting on plaintiff's desk during work hours. Wolfsteller approached Young and abruptly asked her to join him in a conference room. (Young Dep. at 135.)

In the conference room, Wolfsteller showed Young the copies of the button pattern and petition that had been found in the photocopier. He asked her how many copies she had made and whether she thought that making those copies was appropriate. According to Young, she explained to Wolfsteller that she intended to reimburse the city for the expense. Young claims that Wolfsteller was angry and promptly asked her to turn in her key and leave. (Young Dep. at 137-140.) Young gave Wolfsteller her key, gathered her belongings and immediately left city hall. Wolfsteller documented the incident in a memorandum that he placed in Young's personnel file. (See Wolfsteller Dep. Ex. 1.) Prior to April 8, 2004, the city did not have any disciplinary or work performance issues with Young. On April 19, 2004, Wolfsteller wrote Young a letter stating that the city had lost trust and confidence in her ability to perform receptionist duties. (See id. Ex. 2.) The letter detailed Young's unauthorized and inappropriate use of city equipment to produce the "no hostile annexation" button patterns, the petition opposing forced annexation and the MTCAA meeting agenda and minutes. (See id.) Wolfsteller cited to the city's personnel policy that authorizes the city to discipline employees for "pilfering or the unauthorized appropriation of city property."

4

(Id.)  Wolfsteller informed Young that the city council would be acting on his recommendation that her employment be terminated as a result of the above conduct.

At all relevant times, the city did not have a written policy governing the use of the photocopier or city computers for personal purposes.  Most city employees would use the photocopier for personal reasons.  Wolfsteller used the photocopier for a variety of personal purposes throughout his employment as the city administrator.  Jeffrey O'Neill, the Deputy City Administrator, would at times make up to a thousand copies of personal documents for a soccer club that he was involved in and would not receive advance authorization before using the machine.  Employees did not reimburse the city on a sheet-by-sheet basis but would periodically reimburse the city for the amount of copies they had made.  According to Wolfsteller, there was an unwritten policy that city employees would reimburse the city four cents per copied page for any personal use.  Young made a total of 172 copies which, at four cents per page, would have required a reimbursement of $6.88.

Wolfsteller recommended to the Monticello City Council that Young's employment be terminated. Wolfsteller's recommendation was based upon Young's dishonest, secretive, deceptive and unauthorized use of the photocopier without reimbursement.  On April 26, 2004, the Monticello City Council convened and Wolfsteller's recommendation that Young be terminated was discussed.  (See Beety

5

Aff. Ex. 8.)  During that meeting, city councilman Glen Posusta asked Wolfsteller why Young was being terminated for making personal copies on the city's photocopier.  Posusta indicated that Wolfsteller's recommendation was based not on her personal use of city equipment but on the fact that Young's husband was the MTCAA's leader and that she had used the equipment for anti-annexation purposes.  Posusta stated that the Monticello City Council had set precedent that employees would not be terminated based upon use of the photocopier for personal reasons and "had given a carte blanc for employees' use of city equipment."  (See id.)  Nonetheless, the council approved Wolfsteller's recommendation and officially terminated Young's employment, with Posusta voting in opposition.

On October 21, 2004, Young filed this suit alleging that defendants deprived her of her right to free speech under the First Amendment, in violation of 42 U.S.C. § 1983.[2]  Young also asserts a claim of intentional interference with her prospective business advantage against defendant Wolfsteller and intentional infliction of emotional distress against all defendants.  Defendants move for summary judgment on all claims.

---

[2] Plaintiff also pleaded a violation of her First Amendment right to petition the government for redress of grievances. (See Compl. ¶ 20.)  However, plaintiff has not opposed defendants' motion for summary judgment as to that claim or provided the court any legal authority to support such a claim.  Accordingly, defendants' motion is granted as to plaintiff's claim that her right to petition the government was violated.

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. See id. at 255. The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of a claim, summary judgment must be granted

because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

## II.  Plaintiff's § 1983 Claim

Pursuant to 42 U.S.C. § 1983, anyone who, under color of state law, deprives a person of the rights, privileges or immunities secured to them by the United States Constitution can be held liable in an action at law.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  Accordingly, the court first identifies the specific constitutional rights that have allegedly been infringed.  Id.  Plaintiff alleges that defendants violated her First Amendment right to free speech by terminating her employment based upon the constitutionally protected content of the anti-annexation documents that she created on city equipment.

### A.  First Amendment Claim

Defendants argue that plaintiff's speech is not protected by the First Amendment.  A public employer may not discharge an employee "on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383 (1987).  To survive summary judgment, the burden is on the public employee to establish that her speech was constitutionally protected and a substantial or

8

motivating factor in the employment decision. <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>Cox v. Dardanelle Pub. Sch. Dist.</u>, 790 F.3d 668, 672 (8th Cir. 1986). Although the determination of whether the speech is constitutionally protected is a question of law, whether the speech was a motivating factor in the employment determination is a question of fact. <u>Cox</u>, 790 F.3d at 675. Upon such showing, the burden shifts to the employer to prove, by a preponderance of the evidence, that the same employment decision would have been made in the absence of the protected conduct. <u>Id.</u> at 672.

The court determines whether speech is protected by the First Amendment through a two-step inquiry. <u>Kincade v. City of Blue Springs, Mo.</u>, 64 F.3d 389, 395 (8th Cir. 1995). The court first determines whether the speech touches on a matter of public concern. <u>Id.</u> (citing <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). To determine whether an employee's speech addresses a matter of public concern, the court looks to the entire record to evaluate the content, form and context of the statements. <u>Connick</u>, 461 U.S. at 147-48; <u>Kincade</u>, 64 F.3d at 396.

If the speech touches upon a matter of public concern, the court next balances the public employee's interest, as a citizen, in commenting upon the matter with the public employer's interest in promoting the efficiency of performing its services. <u>Kincade</u>, 64 F.3d at 395 (citing <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 574

(1968)). In doing so, the court first asks whether the public employer has produced evidence to indicate that the speech had an adverse impact on the efficiency of the employer's operations. Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000); Sexton v. Martin, 210 F.3d 905, 911-12 (8th Cir. 2000). Absent such a showing, "there are no government interests in efficiency to weigh against First Amendment interests" and the court need not engage in the Pickering balancing test. Belk, 228 F.3d at 881. The employer must, with specificity, demonstrate that the speech created workplace disharmony, impeded the plaintiff's performance or impaired working relationships. Washington v. Normandy Fire Protection Dist., 272 F.3d 522, 527 (8th Cir. 2001) (citing Sexton, 210 F.3d at 913). Mere allegations that workplace disruption occurred or that the contested speech affected morale, without evidentiary support, is insufficient. Belk, 228 F.3d at 881; Sexton, 210 F.3d at 912.

If the employer produces sufficient evidence of workplace disruption, the court then engages in the Pickering balancing test. Belk, 228 F.3d at 878. The court must balance the First Amendment's fundamental aim of protecting speech with the "practical realities involved in the administration of a government office." Connick, 461 U.S. at 154. In applying the Pickering balancing test, the court considers (1) the need for harmony in the workplace, (2) whether the speech caused co-worker relationships to

10

deteriorate, (3) the time, manner and place of the speech, (4) the context, (5) the degree of public interest and (6) whether the speech impeded the employee's ability to perform her duties. Belk, 228 F.3d at 881; see also Pickering, 391 U.S. at 570-73. The court also looks to the role of the employee within the agency because when an employee "serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." Rankin, 483 U.S. at 390-91. Lastly, the court also looks to whether other employees were disciplined for similar conduct that did not invoke protected speech. See Altman v. Minn. Dep't of Corrs., 251 F.3d 1199, 1203 (8th Cir. 2001).

### 1. First Amendment Protection

Defendants do not dispute that plaintiff's speech related to a matter of public concern. The content of all of the documents that plaintiff either created or possessed, for which she was terminated, addressed her opposition to the city of Monticello's controversial annexation proposal. Therefore, the court proceeds to the Pickering balancing test to determine whether her speech is constitutionally protected.

The threshold issue is whether defendants have proffered sufficient evidence to indicate that plaintiff's speech disrupted the city's effectiveness or efficiency in its operations. Belk, 228 F.3d at 881. Defendants argue that given the context of

11

ongoing mediation with Monticello Township, the city was entitled to restrict plaintiff's anti-annexation speech due to the potential for disruption of city operations. Defendants rely on <u>Waters v. Churchill</u>, 511 U.S. 673 (1994), for the proposition that a public employer's speculative predictions of disruption are to be accorded substantial weight and great deference. In <u>Waters</u>, a plurality of the Supreme Court stated that courts are to give greater deference to a government employer's predictions of harm to justify restrictions on employee speech because often the danger presented is speculative. <u>See</u> 511 U.S. at 673. However, the Court further stated that when government employees have a legitimate interest in speaking on matters of public concern, "the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." <u>Id.</u> at 674. The Eighth Circuit has clarified that in order to invoke the <u>Pickering</u> balancing test, it is critical that the employer produce evidence "that the speech activity had an adverse effect on the efficiency" of its operations. <u>Burnham v. Ianni</u>, 119 F.3d 668, 678 (8th Cir. 1997) (en banc).

Defendants have not proffered evidence of actual disruption or any evidence to support their allegation that there was a reasonable probability of disruption due to the ongoing mediation. To the contrary, defendant Wolfsteller testified that the documents plaintiff photocopied and the two agendas that he found on her desk

12

did not disrupt the workplace or create workplace problems. (See Wolfsteller Dep. at 86.) Assistant City Administrator, Jeffrey O'Neill, testified that plaintiff's actions did not jeopardize the city's mediation position or interfere with the mediation process. (See O'Neill Dep. at 30.) The court finds that defendants' speculations regarding the potential for disruption of the work environment are not sufficient to invoke the Pickering balancing test in this case. Absent such a showing, the court concludes that plaintiff's speech was constitutionally protected and could not be the basis of her termination.

The court further finds that plaintiff's speech would be protected even if defendants had provided sufficient evidence of workplace disruption to invoke the Pickering test. Defendants argue that under the Pickering balancing test the city was entitled to restrict plaintiff's anti-annexation speech in light of the ongoing mediation, the divisive nature of the issue and the potential for disruption. The court disagrees. Plaintiff was a part-time receptionist and did not work in a confidential or policymaking position. She created the documents at issue either on her lunch break, after work or on the weekend. She had no direct involvement or role in the mediation in her capacity as a city receptionist. Her interest in speaking out against the annexation proposal stemmed from her personal concern that the township land she owned would be annexed into the city. The

13

documents that she created were not inflammatory and the defendants have not identified how or whether the documents disrupted the work environment. Defendants' speculative argument that plaintiff's possession of such documents in the workplace threatened the city's mediation position is wholly unsupported, if not contradicted, by the record. The court finds that plaintiff's interest in speaking out against the annexation strongly weighs against her employer's ability to discipline her protected speech. Therefore, the court concludes that even if the defendants had produced sufficient evidence of workplace disruption, which they have not, plaintiff's anti-annexation speech would be protected by the First Amendment under the Pickering balancing test.

### 2. Motivating Factor

The court next evaluates whether plaintiff has produced evidence that is sufficient to create an inference that her protected speech was a substantial or motivating factor in the city council's decision to terminate her employment. See Spitzmiller v. Hawkins, 183 F.3d 912, 915 (8th Cir. 1999); Cox, 790 F.2d at 672. Plaintiff has provided evidence to indicate that she was terminated not for violating the unwritten policy regarding usage of the photocopier but for the content of the documents. Other city employees would routinely use the photocopier for personal use without advance authorization or immediate reimbursement. Plaintiff was asked to turn in her key and leave city hall within

thirteen days of Wolfsteller's discovery of the first anti-annexation document that she created.  Prior to asking plaintiff to leave, Wolfsteller did not warn her that photocopying the documents was inappropriate, that she needed advance authorization or that she was to provide immediate reimbursement of the $6.88.  Accordingly, the court finds that plaintiff has met her prima facie burden of proof that her speech was a motivating factor in the defendants' decision to terminate her employment.

The burden then shifts to defendants to establish that the same employment decision would have been made absent the anti-annexation content of the documents.  See Doyle, 429 U.S. 287; Cox, 790 F.2d at 672.  Defendants summarily assert that the content of plaintiff's speech was not a factor because she was terminated based upon the untruthful and deceptive manner in which she violated the unwritten city policy regarding photocopier use and reimbursement.  The court finds that defendants have not met their burden and a genuine issue of material fact exists regarding the motivation behind plaintiff's termination.  Therefore, summary judgment on plaintiff's § 1983 claim is not warranted.

**B.   Qualified Immunity Defense**

Defendant Wolfsteller also moves for summary judgment on grounds of qualified immunity.  Qualified immunity affords protection from civil liability to government agents who perform discretionary functions if their actions are objectively reasonable

15

in light of clearly established legal principles. See Anderson v. Creighton, 483 U.S. 635, 638 (1987). Qualified immunity is a question of law that the court is to decide early so as to shield appropriate public officials from suit. See Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam).

The court first determines whether the facts as alleged by the plaintiff establish a violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). The court has determined that the facts as alleged by plaintiff establish a violation of her First Amendment right to free speech. The court next determines whether the right alleged to be violated was clearly established at the time of the violation. Saucier, 533 U.S. at 202. A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. The qualified immunity defense typically fails when the law is clearly established because reasonably competent public officials should know the law governing their conduct. Darnell v. Ford, 903 F.2d 556, 562 (8th Cir. 1990).

In the context of the First Amendment's protection of freedom of speech, the Eighth Circuit takes a "broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry." Washington, 272 F.3d at 526 (quoting Sexton, 210 F.3d at 909). "No right is more clearly established in our republic than freedom of speech." Casey v. City of Cabool,

16

Mo., 12 F.3d 799, 804 (8th Cir. 1993) (citing Rankin, 483 U.S. at 383). It is long established that public employers "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin, 483 U.S. at 383; see also Belk, 228 F.3d at 882.

Defendant Wolfsteller argues that the First Amendment right alleged to be violated could not have been clearly established due to the fact-intensive nature of the Pickering balancing test. Public employers are not required to balance the Pickering factors prior to making employment decisions and therefore the law is rarely "clearly established" when a balancing of those factors is necessary. Belk, 228 F.3d at 882. However, that reasoning only applies to those cases in which an employer provides sufficient evidence of disruption to invoke the Pickering test. See Belk, 228 F.3d at 882; Sexton, 210 F.3d at 914; Kincade, 64 F.3d at 398-99. When an employer makes no showing of actual or potential disruption sufficient to invoke the Pickering balancing test, the claim of qualified immunity fails. Washington, 272 F.3d at 527.

Defendant relies upon Grantham v. Trickey, 21 F.3d 289 (8th Cir. 1994), and Bartlett v. Fisher, 972 F.2d 911 (8th Cir. 1992). However, in both Grantham and Bartlett the defendant employers had established sufficient evidence of disruption to require the court to balance the Pickering factors to determine whether the speech was protected. See Grantham, 21 F.3d at 295 (evidence linked

17

Grantham's criticisms to problems with his supervisor, work performance, staff morale and functioning of entire operation); Bartlett, 972 F.2d at 917 (defendants placed Pickering test at issue by presenting evidence of adverse impact). Defendant Wolfsteller has made no such showing. Absent a showing of workplace disruption, the court finds that the law was clearly established that defendant Wolfsteller could not recommend plaintiff's termination based upon her constitutionally protected free speech. For this reason, defendant Wolfsteller's claim of qualified immunity fails.

**III. Tortious Interference Claim**

Plaintiff claims that defendant Wolfsteller tortiously interfered with her business relationship with her employer by informing the mayor and city council members that she was a liar and was deceitful.[3] To succeed on a tortious interference claim, plaintiff must establish "(1) the existence of a contract; (2) the alleged wrongdoer had knowledge of the contract; (3) an intentional

---

[3] Plaintiff insists that she pleaded interference with a business advantage, as opposed to a contract. However, the court finds this to be a meaningless distinction. The case law relied upon by plaintiff involves tortious interference with a contract. See, e.g., Nordling v. N. States Power Co., 478 N.W.2d 498, 506 (Minn. 1991) (at-will employment contract); Carter v. Peace Officers Standards & Training Bd., 558 N.W.2d 267, 273 (Minn. Ct. App. 1997) (employment contract). Further, her insistence that the claim be treated as interfering with a business advantage belies the facts of this case. The relationship that plaintiff alleges was interfered with was her employment relationship with the city of Monticello, which arose out of an employment contract.

18

procurement of a breach; (4) the alleged wrongdoer acted without justification; and (5) damages." Maness v. Star-Kist Foods, Inc., 7 F.3d 704, 709 (8th Cir. 1993) (citing Furley Sales and Assocs. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982)).

A party cannot interfere with its own contract. Piekarski v. Home Owners Sav. Bank, 956 F.2d 1484, 1495 (8th Cir. 1992) (citing Nordling v. N. States Power Co., 478 N.W.2d 498, 505 (Minn. 1991)). Accordingly, when an employee is terminated as a result of the actions of an officer or agent of an employer, the employee's dispute remains with the employer for breach of contract and not against the individual agent in tort. Nordling, 478 N.W.2d at 505. To hold a company's officer or agent personally liable for tortious interference with the employment contract, the plaintiff must establish that the officer acted outside of the scope of his responsibilities by proving actual malice and bad faith. See Carter v. Peace Officers Standards & Training Bd., 558 N.W.2d 267, 273 (Minn. Ct. App. 1997). The burden is on the plaintiff to prove that the agent's actions were predominantly motivated by "personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff employee." Nordling, 478 N.W.2d at 507.

Plaintiff has brought forth no evidence to indicate that Wolfsteller was acting outside of the scope of his position, as city administrator, when he recommended to the Monticello City Council that Young's employment be terminated. Further, the record

is devoid of evidence that Wolfsteller's recommendation was motivated by malice, bad faith or an intent to harm Young. Therefore, summary judgment in favor of defendant Wolfsteller is warranted on plaintiff's tortious interference claim.

**IV. Intentional Infliction of Emotional Distress**

Plaintiff's claim of intentional infliction of emotional distress is unsupported by the record. To establish this claim, plaintiff must present evidence of intentional conduct by the defendants that was extreme, outrageous and caused plaintiff severe emotional distress. See Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438-39 (Minn. 1983). The conduct alleged must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Id. Plaintiff has not shown such conduct. Therefore, summary judgment on plaintiff's intentional infliction of emotional distress claim is warranted.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Docket No. 11] is granted in part.

Dated:  March 6, 2006

s/David S. Doty  
David S. Doty, Judge  
United States District Court